**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| GITA F. SANKANO, | |
| **Plaintiff,** | |
| v. | Case No. 8:24-cv-00951-TJS |
| **MAJOR, LINDSEY & AFRICA, LLC,** **ANDY UFBERG, RANDI LEWIS,** **and ELIZA STOKER** | Hon. Timothy J. Sullivan |
| **Defendants.** | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
RULE 12(b)(6) MOTION TO DISMISS AMENDED COMPLAINT**

Kraig B. Long (Fed. Bar No. 25747)
Jeffrey T. Johnson (Fed Bar No. 1724768)
Maya R. Foster (Fed. Bar No. 30733)
NELSON MULLINS RILEY & SCARBOROUGH, LLP
100 South Charles Street, Suite 1600
Baltimore, Maryland 21201
Phone: (443) 392-9400
Facsimile: (443) 392-9499
kraig.long@nelsonmullins.com
jeffrey.johnsono@nelsonmullins.com
maya.foster@nelsonmullins.com

David J. Doyle (pro hac vice)
Alexander A. Pabon (pro hac vice)
SMITH, GAMBRELL & RUSSELL LLP
311 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
Phone: (312) 360-6000
Facsimile: (312) 360-6520
ddoyle@sgrlaw.com
apabon@sgrlaw.com

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND ................................................................................................3

ARGUMENT.........................................................................................................................6

I.       Legal Standard .........................................................................................................6

II.      The Court Should Dismiss the Amended Complaint Because It Fails to Plausibly
         Allege that Defendants Possessed a Retaliatory Motive or Intent.......................7

         A.       Plaintiff's Conclusory Allegations Do Not Satisfy the *Comcast* But-For
                  Standard ...........................................................................................................7

         B.       Plaintiff's Factual Allegations Refute the Notion that Defendants Possessed
                  a Retaliatory Motive or Intent .......................................................................10

III.     The Court Also Should Dismiss Plaintiff's Section 1981 Claim Because No Contract
         Exists Between the Parties....................................................................................14

CONCLUSION ...................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                              **Page(s)**

*Ali v. BC Architects Eng'rs., PLC*,
    832 F. App'x 167 (4th Cir. 2020) ...................................................................................... 8, 12

*Alston v. Spiegel*,
    988 F.3d 564 (1st Cir. 2021) .................................................................................................. 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................... 6, 7, 9, 10

*Awah v. Mansfield Kaseman Health Clinic*,
    2021 WL 6197415 (D. Md. Dec. 30, 2021) .......................................................................... 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 6, 7, 9, 10, 17

*Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*,
    869 F.3d 381 (5th Cir. 2017) .................................................................................................. 12

*Boyer-Liberto v. Fontainebleau Corp.*,
    786 F.3d 264 (4th Cir. 2015) .................................................................................................... 7

*Burke v. Talladega City Bd. of Educ.*,
    2024 WL 714290 (N.D. Ala. Feb. 20, 2024) .......................................................................... 8

*Cochran v. Norkunas*,
    398 Md. 1 (2007) ....................................................................................................................... 17

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
    589 U.S. 327 (2020) ...................................................................................................... 7, 8, 13

*Domino's Pizza, Inc. v. McDonald*,
    546 U.S. 470 (2006) .................................................................................................................. 15

*Dunn v. Uniroyal Chem. Co., Inc.*,
    192 F. Supp. 2d 557 (M.D. La. 2001) .................................................................................... 16

*Echevarria v. AstraZeneca, LP*,
    133 F. Supp. 3d 372 (D.P.R. 2015) ........................................................................................ 10

*Elyazidi v. SunTrust Bank*,
    780 F.3d 227 (4th Cir. 2015) .................................................................................................... 6

*Hayes v. ATL Hawks, LLC*,
    2019 WL 13059765 (N.D. Ga. Dec. 13, 2019) .................................................................... 19

ii

*Jimenez v. Wellstar Health Sys.*,
    596 F.3d 1304 (11th Cir. 2010) ................................................................. 16, 19

*Landor v. Soc'y of the Roman Cath. Church of the Diocese of Lafayette*,
    2014 WL 4639519 (W.D. La. Sept. 15, 2014) ....................................... 18, 19

*Lawrence v. DAP Prod., Inc.*,
    2023 WL 7300560 (D. Md. Nov. 6, 2023) ................................................... 8

*Moye v. Chrysler Corp.*,
    465 F. Supp. 1189 (E.D. Mo. 1979) ........................................................... 16

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ........................................................................ 6

*Painter's Mill Grille, LLC v. Brown*,
    716 F.3d 342 (4th Cir. 2013) ...................................................................... 15

*Pearson v. Prince William Cty. Sch. Bd.*,
    2023 WL 2506415 (E.D. Va. Mar. 14, 2023) ................................. 8, 11, 14

*Pullins v. Hancock Whitney Bank*,
    512 F. Supp. 3d 647 (M.D. La. 2021) ................................................... 16, 18

*Reyes v. Seaton Enters., LLC*,
    2008 WL 2066447 (E.D. Tenn. May 13, 2008) ........................................ 16

*Rice v. Howard Cnty. Gov't*,
    2017 WL 6547994 (D. Md. Dec. 19, 2017) ................................................ 7

*RRC Ne., LLC v. BAA Maryland, Inc.*,
    413 Md. 638, 994 A.2d 430 (2010) ........................................................... 18

*Saas v. Major, Lindsey & Africa, LLC*,
    2024 WL 2113654 (D. Md. May 10, 2024) ............................. 9, 10, 12, 14

*Sanders v. Tikras Tech. Sols. Corp.*,
    725 F. App'x 228 (4th Cir. 2018) .................................................................. 8

*Sojourner-Douglass Coll. v. Middle States Ass'n of Colls. & Sch.*,
    2015 WL 5091994 (D. Md. Aug. 27, 2015) ......................................... 17, 18

*Spencer v. The Perrier Grp. of Am.*,
    1997 WL 282258 (S.D.N.Y. May 28, 1997) ............................................... 8

*Spriggs v. Diamond Auto Glass*,
    165 F.3d 1015 (4th Cir. 1999) ................................................................ 16, 17

*Thompson v. Potomac Elec. Power Co.*,
    312 F.3d 645 (4th Cir. 2002) ............................................................................ 12

*Vouchides v. Houston Cmty. Coll. Sys.*,
    2011 WL 4592057 (S.D. Tex. Sept. 30, 2011) ................................................ 19

*Williams v. Waste Mgmt., Inc.*,
    2019 WL 1573847 (N.D. Tex. Jan. 30, 2019) .................................................. 9

**Statutes**

42 U.S.C. § 1981 ......................................................................................... *passim*

42 U.S.C. § 2000e(c) ................................................................................................ 7

42 U.S.C. § 2000e-3(a) ............................................................................................ 7

Civil Rights Act of 1866 ........................................................................................ 15

Maryland Human Rights Act ....................................................................... 1, 2, 7, 8

Md. Code Ann., State Gov't § 20-606 ..................................................................... 7

Title VII ................................................................................................. 1, 2, 7, 8, 9

## INTRODUCTION

Plaintiff, an attorney, was fired from her last job and hopes to get a new one. Her three-count amended complaint alleges that she was denied the services of a legal recruiter, Defendant Major Lindsey & Africa, LLC ("MLA"), because MLA and three of its employees "retaliated" against her for filing a race discrimination lawsuit against her old firm. The complaint, however, fails to plausibly state a claim for retaliation under any of the statutes she cites.

This is Plaintiff's second bite at the apple. Her first complaint contained a single claim for purported violations of 42 U.S.C. § 1981 (ECF No. 1), and Defendants moved to dismiss it on June 4, 2024 (ECF No. 23). Recognizing the deficiencies in her initial complaint—including her failure to allege that Defendants impaired her contractual rights (a core requirement of any section 1981 claim)—Plaintiff did not respond to Defendants' motion. Instead, she amended her complaint in two material ways: (1) she added retaliation claims under Title VII and the Maryland Human Rights Act ("MHRA"); and (2) she added five new paragraphs to her section 1981 claim that purportedly show she entered into a "contract" with MLA. Because her new complaint fails to cure the fatal deficiencies in her old one, the Court should dismiss it with prejudice.

Notably, all three of Plaintiff's retaliation claims are analyzed under the same standard, whether grounded in section 1981 (Count I), Title VII (Count II), or the MHRA (Count III). And all three are defective for the same reason: Plaintiff failed to plausibly allege that Defendants acted with a retaliatory motive or intent. To state a retaliation claim, a plaintiff must allege facts showing that the adverse action she allegedly experienced was the product of a desire to retaliate against her for engaging in conduct protected by the statute. Here, the supposed protected activity was Plaintiff filing a race discrimination suit against her former law firm, and the supposed adverse action was MLA's refusal to help her find new employment.

But Plaintiff fails to allege causation because she does not allege that MLA refused to work with her *because* she filed race-based claims against her former firm (as opposed to claims for back pay or to redress some other alleged wrongdoing).  Nor could she do so.  MLA's decision, along with its advice that Plaintiff should not make her job search more difficult by suing her prior employer, was entirely unrelated to her bringing discrimination claims against her old firm. It was Plaintiff's filing of *any* lawsuit against her former employer that led MLA to conclude that it no longer made sense for MLA to present her to its law firm clients (and seek the sizable commission a firm would have to pay MLA if it hired her). Because Plaintiff failed to allege facts showing that Defendants purposefully retaliated against her for pursuing race-based claims, she has not plausibly alleged claims under section 1981, Title VII, or the MHRA.

In addition, Plaintiff's five new paragraphs do not save her section 1981 claim from dismissal because she still has not plausibly alleged the existence of a contract between herself and MLA. Section 1981 protects the rights of U.S. citizens to make and enforce contracts without regard to race.  To state a claim under this statute, a plaintiff must identify an existing or prospective contract that the defendant supposedly impaired through discriminatory conduct. The complaint fails to identify such a contract. Unlike her first complaint, which did not even mention the word "contract," Plaintiff now alleges that MLA's agreement to work with her "constituted a contract under the relevant law." (ECF No. 31 ("Compl.") ¶ 75.) But this conclusory allegation is not supported by proper factual averments—and for good reason.  MLA does not enter into contracts with job seekers like Plaintiff.  Rather, MLA enters into contracts with employers, receiving a commission if an employer hires a candidate MLA presents for its consideration. Thus, Defendants' alleged conduct of refusing to work with Plaintiff did not impair her contractual rights, and Count I should join the growing ranks of section 1981 claims that have been dismissed because no contract existed between the parties.

## FACTUAL BACKGROUND[1]

Plaintiff Gita Sankano, a young black female attorney, was hired as an entry-level associate at Pepper Hamilton—now Troutman Pepper Hamilton Sanders LLP ("Troutman")—on August 31, 2019. (Compl. ¶¶ 12, 62.) On November 29, 2023, Troutman fired her. (*Id.* ¶ 72.) Plaintiff claims Troutman terminated her employment "because she complained about race discrimination." (*Id.* ¶ 12.) Nonetheless, Plaintiff alleges that she was optimistic about the future because she "was set to work with MLA," a "massive attorney recruiting agency with 25 office locations, 200+ recruiters and 1,500+ annual placements." (*Id.* ¶¶ 1, 13.) Plaintiff supposedly arranged to work with two of MLA's managing directors—defendants Randi Lewis and Andy Ufberg. (*Id.* ¶ 14.) She was particularly happy about the chance to work with Randi Lewis, as Ms. Lewis had a "stellar reputation for placing diverse candidates." (*Id.* ¶ 15.)

This is not the first time Plaintiff had reached out to Ms. Lewis for help. When Plaintiff's judicial clerkship was coming to an end in 2019, Plaintiff contacted Ms. Lewis in the hopes that Ms. Lewis would assist her in finding an associate position at a law firm. (*Id.* ¶ 60.) Ms. Lewis explained at the time, however, that MLA does not place entry-level associates. (*Id.* ¶ 61.) This makes perfect sense. Law firms are perfectly capable of interviewing attorneys fresh out of law school and will not pay legal recruiters tens of thousands of dollars for steering entry-level attorneys their way. Similarly, as Ms. Lewis tried to explain to Plaintiff in late 2023 and early 2024, law firms will not pay MLA a five-figure commission for introducing them to a young associate with no portable business who recently was fired by—and filed a lawsuit against—her

---

[1] The content of this Factual Background section is taken exclusively from Plaintiff's amended complaint because, on a motion to dismiss, all well-pleaded factual allegations must be taken as true. As a factual matter, however, the complaint is riddled with inaccurate allegations, which Defendants vehemently deny. To cite one example among many, Plaintiff's allegation that MLA destroyed evidence of its conversations with Plaintiff after sending a litigation hold to its employees (Compl. ¶ 115), is patently false.

former firm.  Apparently failing to grasp this basic concept of law firm recruiting, Plaintiff misleadingly (and in conclusory fashion) characterizes the advice Ms. Lewis gave her not to sue Troutman as instructing her "not to stand up for her civil rights." (*Id.* ¶ 19.)

Ms. Lewis allegedly gave Plaintiff this advice on two occasions.  First, Ms. Lewis spoke with Plaintiff by phone on November 30, 2023. (*Id.* ¶ 18.)  During that call, Plaintiff claimed that she had been subjected to race discrimination at Troutman and was fired in retaliation for complaining about it. (*Id.*)  Ms. Lewis allegedly responded, in part, by advising Plaintiff "not to file a lawsuit" against Troutman. (*Id.* ¶ 19.)  Nonetheless, Ms. Lewis agreed to help Plaintiff (and did so). (*Id.* ¶¶ 18-20.)  Second, during a call on January 11, 2024, Ms. Lewis again advised Plaintiff not to sue and told Plaintiff that she "would never find a job if she filed suit." (*Id.* ¶ 20.)  The quotes attributed to Ms. Lewis in the complaint do not state that she was opposed to race discrimination lawsuits; they suggest only that Ms. Lewis believed that, if Plaintiff sued her former law firm, Ms. Lewis would be unable to place her at a new one. (*Id.* ¶ 93 ("**If you file this lawsuit, I can't place you again.  [I] will never find you a job.**").)

Plaintiff rejected Ms. Lewis' advice. On January 17, 2024, Plaintiff sued Troutman for race discrimination and retaliation. (*Id.* ¶ 21.)  The next day, Ms. Lewis allegedly phoned Plaintiff and told her that: (1) Ms. Lewis no longer could work with Plaintiff because she sued Troutman; and (2) an associate position at an unnamed law firm ("Law Firm A") to which Ms. Lewis had submitted Plaintiff's materials no longer was available. (*Id.* ¶¶ 20-21.)  Plaintiff claims the associate position *was* available and, in fact, Plaintiff secured a January 19, 2024 interview at Law Firm A by herself. (*Id.* ¶ 21.)

Word of Plaintiff's lawsuit against Troutman was communicated to various associate recruiters at MLA by email on the morning of January 18, 2024. (*Id.* ¶ 22.)  Commenting on the aggressive nature of the suit, the email's author observed: "This complaint is not messing around."

(*Id.*) Ms. Lewis responded in an email to the group, stating: "I represent her and told her not to sue. Thank you for the heads up." (*Id.*) Defendant Ufberg, who is not alleged to have ever communicated with Plaintiff in any way, responded to the announcement by stating: "That's Randi and my candidate fyi we won't work with her now." (*Id.* ¶ 23.) Responding to this email less than a minute later, Ms. Lewis wrote: "Agreed. I will call her later." (*Id.*)

The third individual defendant, Eliza Stoker, Executive Director of MLA's Associate Practice Group, responded in an email to the group shortly thereafter, stating that "we are not washing our hands of this candidate," but that MLA needed to exit the relationship because of the likelihood that the company would be subpoenaed. (*Id.* ¶ 25.) Plaintiff claims this email effectively "blackballed [her] from MLA." (*Id.* ¶¶ 24, 103, 113.) She supports this contention with allegations that, later that month, when she reached out to another recruiter in MLA's Associate Practice Group, she was told that while the recruiter would have loved to help her, "he can't because [MLA] doesn't want its documents subpoenaed." (*Id.* ¶¶ 107-111.)

The theory behind Plaintiff's claims is that Defendants retaliated against her for "engaging in protected activity"—i.e., filing the Troutman lawsuit. (*Id.* ¶ 117.) In a bizarre call to action, Plaintiff claims that she wants "law firms and companies to blackball MLA," just as she claims MLA blackballed her. (*Id.* ¶ 9.) However, even in her amended complaint, Plaintiff does not allege facts from which one can infer that Defendants harbored any ill will against her or took any adverse action against her because she filed discrimination claims. Instead, a fair reading of the complaint suggests that Ms. Lewis was concerned about the effect that Plaintiff suing her old firm would have on prospective employers *regardless* of the nature of her claims. In other words, it was the filing of *any* lawsuit against Troutman that concerned Ms. Lewis, not the suit's race-based nature, because a prospective employer would have to hire Plaintiff despite both its knowledge of the lawsuit *and* its obligation to pay MLA a sizeable commission. (*Id.* ¶ 78 (admitting that, by working

5

with MLA, "Ms. Sankano's candidacy for any particular position was hindered in that the prospective employer would not only need to pay her, but also MLA, if it chose to hire her").)

Plaintiff's five new paragraphs purporting to allege a "contract" between her and MLA do not contain any facts establishing the formation of a contract under Maryland law. (*Id.* ¶¶ 75-79.) According to Plaintiff, "Ms. Lewis agreed that MLA would work with Ms. Sankano to find her new employment," and "[t]his agreement constituted a contract." (*Id.* ¶ 75.) But nowhere in the complaint does Plaintiff allege facts demonstrating the familiar hallmarks of a contract, such as offer, acceptance, or a mutual assent to be bound by definite terms.

## ARGUMENT

### IV.    Legal Standard

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This requires the plaintiff to "show more than a sheer possibility that the defendant has acted unlawfully." *Id.* In evaluating motions to dismiss, courts must accept as true a complaint's factual allegations and draw all reasonable inferences in the plaintiff's favor. *Elyazidi v. SunTrust Bank*, 780 F.3d 227, 233 (4th Cir. 2015). However, courts need not accept "legal conclusions, … bare assertions devoid of further factual enhancement[,] … unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

In this case, Plaintiff's amended complaint contains three causes of action for retaliation. Although she brings these claims under three separate statutes, each is predicated on the same core allegations—that Defendants retaliated against Plaintiff for filing a race discrimination lawsuit.

Count I, under section 1981, is brought against all four Defendants, and Counts II and III, under Title VII and the MHRA, are brought solely against MLA. As explained below, under the federal pleading standards articulated in *Twombly* and *Iqbal*, Plaintiff has failed to state a claim upon which relief can be granted.

**V.     The Court Should Dismiss the Amended Complaint Because It Fails to Plausibly Allege that Defendants Possessed a Retaliatory Motive or Intent**

      **A.     Plaintiff's Conclusory Allegations Do Not Satisfy the *Comcast* But-For Standard**

The elements of a *prima facie* claim for retaliation are identical under all three statutes at issue—namely, that: (1) the plaintiff engaged in a "protected activity"; (2) the plaintiff's "employer took an adverse employment action against her"; and (3) there was a "causal link between the two events." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (identifying the elements for retaliation claims under section 1981 and Title VII); *Rice v. Howard Cnty. Gov't*, 2017 WL 6547994, at *15 (D. Md. Dec. 19, 2017), *aff'd*, 744 F. App'x 840 (4th Cir. 2018) (explaining that "because the MHRA tracks the language of Title VII, the same criteria apply in analyzing retaliation claims under either statute").[2]

This motion challenges whether Plaintiff has plausibly alleged the third element: causation. In 2020, the U.S. Supreme Court held that, when bringing a race discrimination claim, a plaintiff must allege that she was the victim of purposeful discrimination in which "race was the but-for cause of [her] injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 344

---

[2] Although she does not allege it in her complaint, Plaintiff presumably brings her Title VII and MHRA claims against MLA under the theory that MLA is an "employment agency." *See* 42 U.S.C. § 2000e-3(a); Md. Code Ann., State Gov't § 20-606(b) (prohibiting discrimination by employment agencies "because of the individual's race, color, religion, [etc.]"). Defendants concede for purposes of this Motion that MLA would be considered an "employment agency" under these statutes because MLA procures employment opportunities for attorneys. *See, e.g.,* 42 U.S.C. § 2000e(c) (defining an "employment agency" as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer").

(2020) (J. Ginsburg, concurring). In other words, to allege discrimination, a plaintiff must plead facts from which it may be inferred that "but for race, [she] would not have suffered the loss of a legally protected right." *Id.* at 341 (J. Gorsuch).

Since *Comcast*, federal courts have made clear that, like race discrimination claims, retaliation claims are governed by a but-for causation standard. *See, e.g., Ali v. BC Architects Eng'rs., PLC*, 832 F. App'x 167, 172-73 (4th Cir. 2020) (holding that but-for standard applies to retaliation claims under section 1981); *Pearson v. Prince William Cty. Sch. Bd.*, 2023 WL 2506415, at *7-8 (E.D. Va. Mar. 14, 2023) (stating that "the causation standard is the same for Title VII and § 1981"). When analyzing a retaliation claim, however, the question is not whether the defendant's actions were motivated by the plaintiff's race but, rather, whether the defendant's actions were motived by a desire to retaliate against the plaintiff for *complaining about race*. *See, e.g., Burke v. Talladega City Bd. of Educ.*, 2024 WL 714290, at *5 (N.D. Ala. Feb. 20, 2024) (dismissing section 1981 retaliation claim because plaintiff failed to allege facts "that would prove [defendant's] *retaliatory motive* was a but-for cause" of the adverse action); *Lawrence v. DAP Prod., Inc.*, 2023 WL 7300560, at *7 (D. Md. Nov. 6, 2023) (ruling that section 1981 retaliation claim failed because defendant's statements "lack[ed] any discriminatory animus"); *Sanders v. Tikras Tech. Sols. Corp.*, 725 F. App'x 228, 230 (4th Cir. 2018) (holding that retaliation claim failed where defendants' alleged conduct did not reflect racial discrimination, so plaintiff's "subjective belief that her supervisor was acting with discriminatory intent was not objectively reasonable").

Plaintiff undoubtedly will argue that she engaged in "protected activity" by filing a race discrimination suit against Troutman and that there is a causal link between that protected activity and Defendants' "adverse action"—i.e., their decision to stop working with her. But an adverse reaction to the mere filing of a lawsuit is not enough. *See Spencer v. The Perrier Grp. of Am.*, 1997 WL 282258, at *1 (S.D.N.Y. May 28, 1997) (explaining that the "mere filing" of a complaint does

not "create an automatic presumption that any subsequent [] action adverse to the [plaintiff] is retaliatory in nature"). To state a *prima facie* case for retaliation, Plaintiff must allege facts from which it can be inferred that Defendants wanted to punish her for filing *race-based claims*. *See, e.g., Williams v. Waste Mgmt., Inc.*, 2019 WL 1573847, at *10 (N.D. Tex. Jan. 30, 2019) (holding that retaliation claim failed because plaintiff's complaints of OSHA violations did not implicate activity protected by section 1981).

Plaintiff's complaint does nothing of the sort. Indeed, one cannot glean from her allegations that Defendants' decision to discontinue their relationship with her was motivated by a desire to retaliate against her at all. To the contrary, the complaint suggests only that Defendants believed they would be unable to help Plaintiff find new employment if she sued her old law firm, and they saw no point in continuing to work with her after she did. There are no factual allegations suggesting that Plaintiff's pursuit of race-based claims against her former firm (as opposed to any other type of claims) factored into Defendants' decision-making. And why would it? MLA is a for-profit business. If Defendants believed they could convince a law firm to hire Plaintiff and send MLA a five-figure commission for presenting her to the firm, logic suggests that Defendants would have continued working with her. But MLA knew exactly what Plaintiff now admits in her amended complaint: MLA's commission was a "hinder[ance]" to her candidacy that "impair[ed]" her ability to find new employment. (Compl. ¶ 78.)

To be sure, Plaintiff posits that Defendants "retaliated" against her "because she filed suit to protest the violation of a federal civil right." (*Id.* ¶ 105.) But this is precisely the type of conclusory allegation, devoid of factual content, that *Twombly* and *Iqbal* instruct district courts to ignore. In fact, in a recent opinion, a judge in this District dismissed a Title VII retaliation claim against MLA because the plaintiff did not plead *facts* showing but-for causation. *Saas v. Major, Lindsey & Africa, LLC*, 2024 WL 2113654, at *2 (D. Md. May 10, 2024). In *Saas*, the plaintiff

alleged that MLA had discriminated against her by failing to refer her for potential jobs because MLA used internal tools that disadvantaged women with a "motherhood gap" in their employment. *Id*. at *5. She further alleged that MLA retaliated against her by defaming her to others because she had filed a discrimination charge with the U.S. Equal Employment Opportunity Commission ("EEOC"). *Id.* at *2, *6. The Court, however, found that she had failed to plead a causal "connection between the purported adverse action and her protected activity beyond the conclusory allegation that Defendants [mistreated her] 'because' she filed the EEOC complaint." *Id.* at *6. And because the Court was not allowed to accept this conclusory allegation under *Twombly* and *Iqbal*, the Court dismissed the plaintiff's retaliation claim. *Id.*

The same should happen here. Plaintiff's claims fail as a matter of law because her allegations of retaliatory intent are purely *conclusory*. The complaint contains no *facts* from which one can infer that Defendants sought to punish her for engaging in race-related activity.

### B.     Plaintiff's Factual Allegations Refute the Notion that Defendants Possessed a Retaliatory Motive or Intent

The fact that this is not an employment case factors significantly into Plaintiff's inability to plead causation. The entire concept of retaliation is that a person does something that harms or offends a second person, and the second person punishes the first person in response. *See, e.g.*, *Echevarria v. AstraZeneca, LP*, 133 F. Supp. 3d 372, 400 (D.P.R. 2015), *aff'd*, 856 F.3d 119 (1st Cir. 2017) (stating that "[a]t its core, retaliation may be viewed as a modality of vengeance on account of a prior event, to punish someone because of it"). This explains why the vast majority of retaliation cases are grounded in employment relationships. Under the typical fact pattern, an employee publicly accuses her employer of engaging in discriminatory practices—by telling co-workers, complaining to management, or filing a lawsuit or an EEOC claim—and the employer responds by firing, demoting, or not promoting the employee. A retaliatory motive is easy to

discern in such cases. *See, e.g.*, *Pearson*, 2023 WL 2506415, at *8 (discussing the methods to prove a causal link and dismissing section 1981 employment retaliation claim).

Here, in contrast, Plaintiff did nothing to harm or offend Defendants. She simply picked a fight with her former employer. Plaintiff has not alleged, and cannot allege, any facts creating an inference that Defendants wanted to punish her for filing race-based claims against her old firm. Stated differently, Plaintiff has not alleged that, "but for" her filing of claims implicating the concerns behind the anti-discrimination statutes at issue, MLA would have continued working with her. Rather, the only fair inference to be drawn from Plaintiff's allegations is that MLA would have discontinued its relationship with her if she had filed *any* claims against Troutman, *regardless of their nature*, because of the perceived impact such a lawsuit would have on MLA's ability to help Plaintiff gain future employment.

Instead of supporting her theory that Defendants harbored a discriminatory animus or retaliatory motive against her, many of Plaintiff's allegations strongly *refute* that theory. First, Plaintiff concedes that Ms. Lewis has a "stellar reputation for placing diverse candidates" and that she once served as the Diversity, Equity, and Inclusion recruiter at a prominent Maryland law firm. (Compl. ¶ 15.) When Plaintiff was in law school, her classmates told her that if she ever needed a job, she should contact Ms. Lewis because "Ms. Lewis was well known as the best recruiter to place diverse candidates." (*Id.* ¶¶ 58-59.) Consistent with this reputation, Ms. Lewis gave Plaintiff free advice in 2019 and again in 2023 and 2024, reviewing Plaintiff's resume and agreeing to provide her materials to a prospective employer. (*Id.* ¶¶ 58-61, 73-74, 80-94.) There is no suggestion anywhere in the complaint that Ms. Lewis or any other Defendant was biased against or had an animus toward minorities pursuing race-based claims.

Second, the fact that Ms. Lewis continued working with Plaintiff after Plaintiff first engaged in protected activity refutes the notion that Defendants possessed a retaliatory intent.

On November 30, 2023, Plaintiff informed Ms. Lewis that she "complain[ed] about discrimination" at Troutman—a type of protected activity because it involves the exercise of protected rights—yet Ms. Lewis agreed to work with Plaintiff and to submit her materials to Law Firm A. (Compl. ¶¶ 18-20); *see also Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 390 (5th Cir. 2017) (affirming dismissal of section 1981 retaliation claim where adverse action was taken both before and after the protected activity); *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002) (affirming summary judgment for the same reason). If MLA and Ms. Lewis were inclined to retaliate against Plaintiff for complaining about race discrimination, they would have severed ties with Plaintiff when she first started complaining to Troutman. But they did not, showing that what Ms. Lewis cared about was the filing of a *lawsuit* against Troutman, *not* Plaintiff complaining about race or attempting to vindicate her rights.

Third, and relatedly, Plaintiff's conclusory allegations of causation are "further weakened" by allegations that, when read fairly and in a light most favorable to her, suggest that MLA had a race-neutral reason for not working with her. *See, e.g., Ali,* 832 F. App'x at 173 ("[A]ny inference of retaliation is further weakened by the operative complaint's allegation that [plaintiff] was not selected for the structural engineer position because she was more valuable to [defendant] as a CAD drafter"); *Saas*, 2024 WL 2113654, at *6 (dismissing Title VII retaliation claim against MLA and noting that "elsewhere in the Complaint, Plaintiff identifies a different purported motive for Defendants' actions"). Plaintiff admits that Ms. Lewis repeatedly warned her that filing a lawsuit against Troutman would make it impossible for Ms. Lewis to place her. When one sets aside Plaintiff's conclusions, her factual allegations of alleged misconduct are entirely consistent with a race-neutral desire to explain what any experienced legal recruiter knows: suing your old law firm for any reason is a red flag that will make it much more difficult for you to find new employment,

particularly through a recruiter who will require your new employer to pay a recruitment fee. (*See* Compl. ¶ 78.)

Rather than crediting Plaintiff's self-serving spin, the Court should examine what Ms. Lewis actually *said*, as alleged in bold font in the complaint. According to Plaintiff, Ms. Lewis told her:

- on November 30, 2023, "**Whatever you do, do not file [a lawsuit].**"; and

- on January 11, 2024, **"If you file this lawsuit, I can't place you again. [I] will never find you a job."**

(Compl. ¶¶ 74, 80-82, 90-93.) These statements do not suggest that Ms. Lewis cared whether Plaintiff filed race-based claims against Troutman. Indeed, one could reach this conclusion only through rank speculation that ignores Ms. Lewis' well-known reputation for working with diverse attorneys. The logical inference from Ms. Lewis' statements is that Ms. Lewis was concerned about the impact of Plaintiff filing a lawsuit on firms that might consider hiring her. By saying "I can't place you," and "[I] will never find you a job," Ms. Lewis is not saying that filing a lawsuit would offend her; rather, she is saying in a race-neutral way that she no longer will be able to *help* Plaintiff because (on top of Plaintiff being recently fired and relatively inexperienced) the lawsuit will deter MLA's law firm clients from hiring Plaintiff for an associate position and agreeing to pay MLA a sizeable commission.

The same is true of the internal MLA emails that appear in the complaint, and the notes in MLA's internal "Bullhorn" tracking system. Although these writings reference the fact that Plaintiff filed a discrimination lawsuit (*id.* ¶¶ 114-15), they do not in any way suggest that MLA discontinued its relationship with Plaintiff *because* she included race-based claims in the Troutman complaint. As such, they do not plausibly allege "but for" causation, as *Comcast* requires. Plaintiff alleges that during the November 30, 2023 call, Ms. Lewis tried to dissuade Plaintiff from suing by stating: "I have a lot of white clients who have been let go." (*Id.* ¶ 18.) But like the rest of

Plaintiff's allegations, this allegation does not support an inference that, when Ms. Lewis told Plaintiff a month-and-a-half later that it no longer made sense for them to work together, Ms. Lewis possessed a retaliatory motive or intent.

In the end, Plaintiff rests her entire claim on two facts: (1) Defendants learning on January 18, 2024 that she had filed a lawsuit against Troutman; and (2) Defendants ending their relationship with her immediately thereafter. For the reasons explained above, this is not enough to state a claim for relief because one cannot plausibly infer from these facts that Defendants' conduct was motivated by a discriminatory animus or retaliatory intent. *See Pearson*, 2023 WL 2506415, at *8 (dismissing section 1981 retaliation claim because there was "plenty of *speculation*" as to why defendant did not give plaintiff a job reference but "no factual allegations connecting his protected activity to the adverse action, let alone 'regular acts showing animus or antagonism'") (citation omitted); *Saas*, 2024 WL 2113654, at *6 (dismissing retaliation claim against MLA where plaintiff "simply speculat[ed] something [was] true with no supportive factual allegations").

There are perfectly good, non-discriminatory reasons—based on decades of recruiting experience—why Defendants reacted the way they did to learning about the Troutman lawsuit. Plaintiff may disagree with Ms. Lewis' assessment that she "will never find [Plaintiff] a job," but one cannot infer from her allegations that Plaintiff was the target of purposeful discrimination, or that Defendants would have continued their relationship with her "but for" her including race-based claims in the Troutman complaint. Because Plaintiff failed to plausibly allege that Defendants possessed a retaliatory motive—and because she already had a chance to cure this fatal pleading defect and could not—the Court should dismiss her complaint with prejudice.

## VI.    The Court Also Should Dismiss Plaintiff's Section 1981 Claim Because No Contract Exists Between the Parties

Count I for retaliation under section 1981 should be dismissed for the additional reason that MLA had no contract with Plaintiff.

Congress passed the Civil Rights Act of 1866 in the aftermath of the Civil War to vindicate the rights of former slaves.  The Act contained language codified today in section 1981, which guarantees black citizens "the same right in every State and Territory to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  By its plain terms, section 1981 prevents persons from impeding the "contractual relationships" of protected minorities through discriminatory conduct. 42 U.S.C. § 1981(b).  In keeping with the focus of the statute, the Supreme Court has held that claims brought under section 1981 must "identify an impaired 'contractual relationship,' … under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

As the Court explained, section 1981 is not a "cure-all" that was "meant to provide an omnibus remedy for *all* racial injustice." *Id.* at 479.  Rather, it is squarely grounded in the right to enjoy the benefits of *contracts*.  Quoting the Supreme Court, the First Circuit has stated that "Section 1981 is not a full suit of armor—a 'strange remedial provision designed to fight racial animus in all its noxious forms.'" *Alston v. Spiegel*, 988 F.3d 564, 574 (1st Cir. 2021) (quoting *Domino's Pizza*, 546 U.S. at 476).  " 'Rather, it is a bullet proof vest, designed specifically to safeguard contractual relationships." *Id.*  Accordingly, "a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under [an] existing (or proposed) contract that he wishes to 'make and enforce.'" *Domino's Pizza*, 546 U.S. at 479-80.

Because section 1981 prohibits race discrimination only in the making and enforcement of contracts, courts in the Fourth Circuit and elsewhere routinely dismiss section 1981 claims when there is no contract between the plaintiff and the defendant.  *See, e.g., Domino's Pizza*, 546 U.S. at 479-80 (reversing Ninth Circuit and agreeing with district court that section 1981 claim should have been dismissed because plaintiff had no contract with defendant); *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 348 (4th Cir. 2013) (affirming dismissal of section 1981 claims where

15

plaintiffs had no contract with defendants); *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1308-11 (11th Cir. 2010) (affirming dismissal of section 1981 claims because doctor who was denied medical staff privileges at defendant healthcare system had no contractual right to such privileges); *Pullins v. Hancock Whitney Bank*, 512 F. Supp. 3d 647, 664 (M.D. La. 2021) (dismissing section 1981 claim and stating that plaintiff's "fail[ure] to identify the contract at issue … is fatal"); *Reyes v. Seaton Enters., LLC*, 2008 WL 2066447, at *7 (E.D. Tenn. May 13, 2008) ("There is neither a contractual relationship alleged in the complaint, nor any indication plaintiff Sandra Reyes intended to form a contractual relationship with any of the Defendants.  So the complaint fails to state a claim for which relief may be granted…"); *Dunn v. Uniroyal Chem. Co., Inc.*, 192 F. Supp. 2d 557, 561 (M.D. La. 2001) (dismissing section 1981 claim because plaintiff had no contract with defendant); *Moye v. Chrysler Corp.*, 465 F. Supp. 1189, 1190 (E.D. Mo. 1979) (dismissing section 1981 claim where plaintiff failed to allege a "contract or deprivation of rights to contract").

Here, Plaintiff has failed to plausibly allege that she entered into a contract with one or more of the Defendants.  To be sure, Plaintiff contacted Ms. Lewis for free advice, called her on numerous occasions, submitted her resume to Ms. Lewis for feedback, asked Ms. Lewis about job openings, and asked Ms. Lewis to present her to at least one law firm for the firm's consideration. (Compl. ¶¶ 18-20, 81-94.)  Indeed, hoping to capitalize on Ms. Lewis' "stellar reputation for placing diverse candidates," even after Ms. Lewis allegedly reacted negatively to the news that Plaintiff might sue her former law firm, Plaintiff continued to request favors from Ms. Lewis in an attempt to "get her career back on track." (*Id.* ¶¶ 15, 74, 80-90.)  But Plaintiff's relationship with Ms. Lewis was not a *contractual* relationship that could give rise to a section 1981 claim, despite Plaintiff's conclusory allegations to the contrary.

For her section 1981 claim to survive dismissal, Plaintiff must plead the existence of a contract under Maryland state law. *See Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018 (4th

Cir. 1999) (analyzing Maryland law to determine whether a contract existed for purposes of section 1981 claim). "Under Maryland law, it is 'well-established' that 'a complaint alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" *Sojourner-Douglass Coll. v. Middle States Ass'n of Colls. & Sch.*, 2015 WL 5091994, at *43 (D. Md. Aug. 27, 2015) (dismissing breach of contract and section 1981 claim for failure to allege the basis of a contract). "Further, it 'is universally accepted that a manifestation of mutual assent is an essential prerequisite to the creation or formation of a contract.'" *Id.* (citing *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Id.*

The *Sojourner-Douglass* court dismissed breach of contract and section 1981 claims because the complaint failed to allege facts showing the parties agreed to "particular terms" and that the defendant breached particular terms. *Id.* at *44. The court also cited *Twombly* for the proposition that while a contract conceivably *could* exist between the parties, the complaint failed to "contain sufficient factual detail to "nudge[ the plaintiff's] claims across the line from conceivable to plausible." *Id.*; *see also Awah v. Mansfield Kaseman Health Clinic*, 2021 WL 6197415, at *8 (D. Md. Dec. 30, 2021) (dismissing section 1981 claim because "[n]o facts make clear what, if any, contract existed between Awah and Defendants" or "the terms and conditions of the purported contract").

Plaintiff's new allegations do nothing to establish the existence of a contract between her and MLA. In these new allegations, Plaintiff hopes to plead around the fact that recruiting firms like MLA enter into contracts with law firms, *not* job seekers who request their services. Specifically, Plaintiff now alleges the following:

- **Paragraph 75:** During a phone call on November 30, 2023, "Ms. Lewis agreed that MLA would work with Ms. Sankano to find her new employment." This

17

supposedly "constituted a contract" because both sides "promised to provide things of value that amounted to consideration."

- **Paragraph 76:** The consideration Plaintiff supposedly provided to MLA was the ability to present her to potential employers.

- **Paragraph 77:** Plaintiff, in turn, provided MLA with "a degree of exclusivity" in that, once MLA presented Plaintiff to a law firm, that firm could not hire Plaintiff without paying MLA a fee.

- **Paragraph 78:** Working with MLA also "impair[ed]" Plaintiff's ability to be hired because it "effectively precluded" her from obtaining employment through direct outreach, and MLA's fee was a "hinder[ance]."

- **Paragraph 79:** Plaintiff "stood to benefit" from MLA's credibility, success rate, and advocacy.

These allegations do not meet the standard for contract formation in *Sojourner-Douglass.* First, Plaintiff has not "allege[d] with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff." *RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 655, 994 A.2d 430, 440 (2010). In *RRC*, Maryland's highest court affirmed the dismissal of a breach of contract claim where the plaintiff made "no allegation, beyond [a] conclusory statement" that the defendant "ever obligated itself in any manner" to specific terms. *Id.* at 658, 994 A.2d at 442. Here, too, there are no allegations that Ms. Lewis agreed to do anything specific for Plaintiff, or to meet any standard of performance or diligence, such that she or MLA could be sued for breach for failing to perform as expected. An oral assent to "work with" someone does not evidence the type of definite terms required to constitute a binding contract. (Compl. ¶ 75).

Critically, Plaintiff does not allege that any money changed hands (or ever would change hands) between herself and Ms. Lewis. She does not allege that their supposed "contract" was for a particular term or duration. In fact, she does not even allege that there was an offer and acceptance, which are fundamental hallmarks of any contract. *See, e.g.*, *Pullins*, 512 F. Supp. 3d at 663-64 (dismissing section 1981 claim because plaintiff failed to identify the "content of the contract at issue" or any "particular contractual rights"); *Landor v. Soc'y of the Roman Cath.*

*Church of the Diocese of Lafayette*, 2014 WL 4639519, at *3 (W.D. La. Sept. 15, 2014), *aff'd*, 609 F. App'x 239 (5th Cir. 2015) (dismissing section 1981 claim because a student handbook did not contain a "specific contract or contract terms"); *Vouchides v. Houston Cmty. Coll. Sys.*, 2011 WL 4592057, at *8 (S.D. Tex. Sept. 30, 2011) (dismissing section 1981 claim where a supposed "contract to attend [school]" did not "identify the specific contract or contract terms").

Plaintiff's allegations of consideration also are lacking. Merely because MLA *could* have benefitted from its relationship with Plaintiff does not show that the parties formed a contract. *Jimenez*, 2009 WL 10668523, at *4 (dismissing section 1981 claim because "[t]he mere fact that [plaintiff physician] would benefit from performance of an agreement with reference to treatment at the hospital of the patients is insufficient to give [him] any rights or to create or make [him a contracting party] with enforceable rights"). And although Plaintiff confusingly alleges that she gave up something of value by granting MLA a "degree of exclusivity," she does not claim that she had an exclusive agreement with MLA, and her allegations prove just the opposite. (*See* Compl. ¶¶ 94-95 (alleging that Plaintiff submitted materials on her own to a law firm and obtained an interview even after speaking with Ms. Lewis about presenting her to that same firm).)

In the end, section 1981 "protects someone in his or her right to negotiate, execute, perform, modify, or terminate a contract as well as the right to enjoy all the privileges of the contractual relationship. Nothing suggests it goes further to protect someone in the provision of non-contractual related rights." *Hayes v. ATL Hawks, LLC*, 2019 WL 13059765, at *12 (N.D. Ga. Dec. 13, 2019) (dismissing section 1981 retaliation claim), *aff'd*, 844 F. App'x 117 (11th Cir. 2021). Here, Plaintiff and MLA were not beholden to each other in any way. MLA could have presented Plaintiff to dozens of firms or none at all, and she would have had no claim for breach. And Plaintiff could have ignored MLA's advice (which she did) and solicited law firms on her own (which she also did), and MLA would have had no recourse against her. Because Plaintiff failed to plausibly

19

allege that she had a contract with Defendants and that Defendants did something to impair her rights under that contract, her section 1981 claim must be dismissed. And because Plaintiff already tried to cure this pleading defect once and failed, the Court should dismiss Count I with prejudice.

## **CONCLUSION**

For the foregoing reasons, Defendants Major, Lindsey & Africa, LLC, Randi Lewis, Andy Ufberg, and Eliza Stoker respectfully request that the Court dismiss Plaintiff's Amended Complaint in its entirety, with prejudice, under Rule 12(b)(6) and grant Defendants any other relief the Court deems just and proper.

August 16, 2024                                   Respectfully submitted,

/s/ *Kraig B. Long*
Kraig B. Long (Fed. Bar No. 25747)
Jeffrey T. Johnson (Fed Bar No. 1724768)
Maya R. Foster (Fed. Bar No. 30733)
NELSON MULLINS RILEY & SCARBOROUGH, LLP
100 South Charles Street, Suite 1600
Baltimore, Maryland 21201
Phone: (443) 392-9400
Facsimile: (443) 392-9499
kraig.long@nelsonmullins.com
jeffrey.johnsono@nelsonmullins.com
maya.foster@nelsonmullins.com

David J. Doyle (*pro hac vice*)
Alexander A. Pabon (*pro hac vice*)
SMITH, GAMBRELL & RUSSELL LLP
311 S. Wacker Drive, Suite 3000
Chicago, Illinios 60606
Phone: (312) 360-6000
Facsimile: (312) 360-6520
ddoyle@sgrlaw.com
apabon@sgrlaw.com

***Counsel for Defendants,***
***Major, Lindsey & Africa, LLC, Andy***
***Ufberg, Randi Lewis, and Eliza Stoker***